# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**ELIZABETH FRITZSCHE,**

    Plaintiff,

v.                                            No. CIV 01-0050 BB/WWD

**ALBUQUERQUE MUNICIPAL SCHOOL DISTRICT,
a/k/a ALBUQUERQUE PUBLIC SCHOOLS, et al.,**

    Defendants.

## MEMORANDUM OPINION

**THIS MATTER** comes before the Court on the defendants' amended motion to dismiss and motion for summary judgment (Doc. 42) on the plaintiff's complaint (Doc. 1), wherein the plaintiff, a Caucasian female, claims the defendants committed reverse racial discrimination against her by hiring an allegedly less-qualified African-American male for a specific teaching position. The Court has examined the parties' submissions and the relevant legal authorities, and, for the reasons set forth below, finds that the defendants are entitled to summary judgment and, therefore, plaintiff's complaint will be **DISMISSED** with prejudice.

## I.
## FACTUAL BACKGROUND

Plaintiff Elizabeth Fritzsche ("Plaintiff"), a Caucasian female, received a Bachelor of Fine Arts degree in 1977 from the University of New Mexico ("University"), where she majored in studio arts and minored in English and art history. See Plaintiff's exhibit A at 3, ll. 19-23; Plaintiff's complaint at 5, ¶ 12. Plaintiff received her teacher certification from the University in 1983 with an endorsement in art. See Plaintiff's exhibit A at 4, ll. 1-13. She received an endorsement in English

in 1984. Four years later, she received a masters degree from the University with a major in art education and a minor in studio art.

In 1983, Plaintiff performed the student teacher work necessary to obtain her teacher certification. See id. at 5, ll. 9-24. Upon receiving her teacher certification, Plaintiff accepted a teaching employment with Bernalillo Public Schools in Bernalillo, New Mexico. From 1984 to 1993, she was employed by Bernalillo Public Schools, teaching classes in fine arts, presiding over the Indian Club, coaching the volleyball team, and acting as a class sponsor.

In 1995, Plaintiff left Bernalillo Public Schools and began her employment with Defendant Albuquerque Public Schools ("APS") in Albuquerque, New Mexico. See Plaintiff's complaint at 5-6, ¶ 14. During the 1995 school year, she worked at Sandia High School with teaching assignments in Ceramics 1, 2, and 3; Painting & Drawing 1 and 2; and Independent Study. During the 1996 school year, she worked at Cibola High School with teaching assignments in Art 1. During the 1997-2000 school years, she worked at Rio Grande High School ("Rio Grande") with teaching assignments in Art 1 and 2; and Ceramics 1, 2, and 3.

In November 1999, Plaintiff learned that La Cueva High School ("La Cueva"), which is a part of the APS school system, needed a person to teach Ceramics and Art 1 after the winter break. See Plaintiff's exhibit A at 16-17. Plaintiff was interested in the position because in her prior teaching experiences she had worked with students that, relative to the students at La Cueva, she believed had "lower test scores, lower math skills, [and] lower reading comprehension skills." Id. at 29, ll. 12-19. She felt that the higher proportion of special education students at Rio Grande kept her from working with students who "could handle some glaze chemistry or some reading in art history and criticism." Defendants' exhibit A at 31, ll. 9-11; see Plaintiff's exhibit A at 29, ll. 9-24. "Desiring to achieve a

2

measure of professional growth," Plaintiff contacted La Cueva's principal, Defendant JoAnn Coffee ("Principal"), to express her interest in the employment. See Plaintiff's complaint at 6, ¶ 16. The Principal informed Plaintiff later that afternoon that she was selected for an interview with La Cueva's interview committee.

Plaintiff interviewed for the teaching employment at La Cueva the following day. The committee that interviewed Plaintiff consisted of the Principal and one of La Cueva's assistant principals, Defendant Gloria Olds ("Assistant Principal"). See Defendants' exhibit A at 18, ll. 21-25. The format of the interview consisted of four essential core questions, which were listed on an interview sheet entitled "Interview Questions," plus any spontaneous questions that might arise in response to the candidate's answers. See Defendants' exhibit B at 22, ll. 4-21; see also Plaintiff's exhibit E, sub-exhibit 2. Each interviewer graded the candidate's responses on the interview sheet. The completed interview sheets were given to the Principal immediately after each interview. See Defendants' exhibit B at 22, ll. 23-25. In addition to asking questions of Plaintiff, the interview committee considered Plaintiff's curriculum vitae and viewed picture slides of her artwork. See id. at 38, ll. 12-25; see also Defendants' exhibit C at 31, ll. 22-25.

James Mitchell, an African-American male, also interviewed for the teaching employment at La Cueva. Mr. Mitchell did not have his teacher certification at the time of his interview but was scheduled to (and did in fact) receive his certification before the employment commenced. See Defendants' exhibit B at 50, ll. 20-25. The committee that interviewed Mr. Mitchell consisted of the Principal, the Assistant Principal, and another assistant principal, Sammy Soto. See Defendants' exhibit C at 17, ll. 21-25. The format of Mr. Mitchell's interview was the same as Plaintiff's. During the course of his interview, Mr. Mitchell stated that he was involved with the Black Student Union

3

at the University and that he was interested in working with the black students at La Cueva. See Defendants' exhibit B at 28-29. It is unclear whether Mr. Mitchell made those statements on his own initiative or whether he made them in response to a question posed by Mr. Soto. See id.; Defendants' exhibit C at 40-41; Defendants' exhibit D at 18, ll. 6-25. In addition to asking questions, the interview committee considered Mr. Mitchell's resume and viewed picture slides of his artwork. See Defendants' exhibit C at 32, ll. 7-9; Plaintiff's exhibit B at 15, ll. 9-25.

After the interview process was completed, the Principal, with the help of the Assistant Principal and Mr. Soto, assessed the candidates for the open position. See Defendants' exhibit C at 16-17. Factors used in assessing each candidate were the candidate's credentials, the candidate's interview, the students with whom the candidate would be working, and an overall consideration of who would work best with a diverse and changing group of students. See id. at 33, ll. 10-17. The Principal, along with the other members of the interview committee, deemed the most important factor to be each candidate's ability to work with the students enrolled in Ceramics and Art 1, not the candidate's experience or art portfolio, because the students in that class were special education and at-risk students who lacked serious interest in art and needed a great deal of discipline. See id. at 34, ll. 13-18; Defendant's exhibit B at 16, ll. 9-16; Plaintiff's exhibit F at 26, ll. 1-10.

The members of the interview committee unanimously opined that Mr. Mitchell would be the best person for the job based on his superior interview, his innovative ideas, his organizational skills, and his perceived ability to discipline the students enrolled in Ceramics and Art 1. See Defendants' exhibit C at 16-17 and 35-37. In contrast, the members of the interview committee opined that Plaintiff would not be the best person for the job because she seemed to be interested in working with advanced students, not the youth enrolled in Ceramics and Art 1. See id. at 34, ll. 19-24; Defendants'

4

exhibit B at 25-26. Thus, while Plaintiff had a great deal of teaching experience and a superior art portfolio, the interview committee believed that Mr. Mitchell had a superior ability and desire to work with the students enrolled in Ceramics and Art 1. Based on the foregoing assessments, the Principal, who was the sole decision-maker regarding which candidate to hire for the open position, decided to hire Mr. Mitchell. See Defendants' exhibit C at 16-17.

The Principal informed a staffing specialist in APS's human resources department, Defendant Guy Seiler ("Staffer"), of her decision to hire Mr. Mitchell. See id. at 18, ll. 9-15. Neither the human resources department nor the Staffer had anything to do with the Principal's hiring decision. See id. at 17-18. Their responsibility in this matter was limited to extending an offer of employment to Mr. Mitchell, the person selected by the Principal.

Plaintiff subsequently learned that the Principal had selected Mr. Mitchell for the open position. See Defendants' exhibit A at 41, ll. 3-7. She also learned that during his interview, Mr. Mitchell stated that he was interested in working with the black student population at La Cueva. Plaintiff was told that the interview committee allegedly asked Mr. Mitchell, "If we hire you, will you be willing to lead a Black Student Union for La Cueva?" Id. at 51, ll. 1-10; Plaintiff's complaint at 7, ¶ 21. Based on her opinion that she had superior qualifications and the fact that the interview committee never asked her if she would lead the Black Student Union for La Cueva, Plaintiff formed the belief that she had been denied the teaching position because of her race. See Plaintiff's complaint at 8, ¶¶ 25-27.

In April 2000, Plaintiff accepted a higher-paying teaching employment at the Albuquerque Academy. See Defendants' exhibit A at 78-80. In May 2000, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). See id. at 10, ¶ 33. In July 2000,

5

Plaintiff resigned her position with APS, because the Defendants' alleged discriminatory conduct made her working conditions intolerable. See id. at 11, ¶ 35. The EEOC issued Plaintiff a right to sue letter in October 2000. See id. at 10, ¶ 33. Plaintiff filed this lawsuit less than three months later, seeking redress under 42 U.S.C. § 2000e-2(a)(1) ("Title VII"); 42 U.S.C. §§ 1981, 1981a, and 1983; and the Fourteenth Amendment to the United States Constitution.

## II.
## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In evaluating a motion for summary judgment, the court views the evidence and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party. See Martin v. Kansas, 190 F.3d 1120, 1129 (10th Cir. 1999). However, it is "not required to evaluate every conceivable inference which can be drawn from evidentiary matter, but only reasonable ones." Lucas v. Dover Corp., 857 F.2d 1397, 1401 (10th Cir. 1988).

The party moving for summary judgment bears the burden of showing that no genuine issue of material fact exists. See Adams v. American Guarantee and Liability Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2000); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir.1998) (stating that moving party may satisfy its burden by "pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."). Once the movant meets its burden, the nonmovant must identify evidence that would enable a trier of fact to find in the nonmovant's favor. See Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1024 (10th Cir. 1992).

# III.
# DISCUSSION

## A. Individual Capacity

Defendants contend, and the Court agrees, that Plaintiff's Title VII claim against the individual Defendants in their individual capacities should be dismissed, because Title VII does not impose liability upon individual employees. See Defendants' opening brief at 8. As the Tenth Circuit has stated:

> Under Title VII, suits against individuals must proceed in their official capacity; individual capacity suits are inappropriate. The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of [Title VII].

Haynes v. Williams, 88 F.3d 898, 899 (10th Cir. 1996) (internal quotation omitted). Accordingly, Plaintiff's claim under Title VII will be dismissed against the individual Defendants in their individual capacities.

## B. Adverse Employment Action

Defendants next contend that Plaintiff's Title VII claim against the Defendants in their official capacities should be dismissed, because the denial of a purely lateral transfer does not constitute an adverse employment action. See Defendants' opening brief at 18, *citing* Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (10th Cir. 1998); see also Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (stating an adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

Defendants misapprehend Plaintiff's Title VII claim. Plaintiff does not contend that the denial of her request for a lateral transfer constitutes an adverse employment action. Rather, she contends

7

that the discriminatory conduct allegedly inherent to that denial made her working conditions intolerable, thereby forcing her to resign her employment at APS. See Plaintiff's complaint at 11, ¶ 35. Plaintiff therefore seeks to recover under a constructive discharge theory, not under a denial-of-transfer theory. See Plaintiff's response brief at 26, *citing* Daemi v. Church's Fried Chicken, 931 F.2d 1379, 1386 (10th Cir. 1991) (recognizing that a plaintiff may assert a constructive discharge claim under Title VII). Accordingly, Plaintiff's claim under Title VII will not be dismissed for failing to allege a cognizable adverse employment action.

**C. Reverse Race Discrimination**

**1. prima facie case**

Defendants contend that Plaintiff's complaint should be dismissed, because Plaintiff allegedly cannot establish a prima facie case that Defendants discriminated against her on account of her race. See Defendants' opening brief at 12. In order to sustain the claims set forth in her complaint, Plaintiff must establish a prima facie case that an adverse employment action was taken against her under circumstances giving rise to a reasonable inference of unlawful discrimination. See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1227 (10th Cir.2000) ("A plaintiff who alleges discriminatory discharge on the basis of race pursuant to Title VII, 42 U.S.C. § 1983, or [42 U.S.C.] § 1981 would have to establish the same elements in order to make out a prima facie case under the McDonnell Douglas burden-shifting analysis.") (emphasis added). There must be "a logical connection between each element of the prima facie case and the inference of race discrimination." Perry v. Woodward, 199 F.3d 1126, 1136 (10th Cir. 1999).

Plaintiff may establish a prima facie case of reverse racial discrimination by presenting evidence that: (1) her employer is one of those unusual employers who discriminates against the

majority race; (2) she applied and was qualified for the open employment; (3) despite her qualifications, she was rejected; and (4) after her rejection, the position was awarded to another applicant. See Notari v. Denver Water Dep't., 971 F.2d 585, 588 (10th Cir. 1992), *citing* McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Another way Plaintiff can proceed is to present "direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff." Id. at 590.

Plaintiff makes no attempt to avail herself of the McDonnell Douglas presumption, so she must present either direct evidence of reverse racial discrimination or indirect evidence sustaining a reasonable inference that she would have received the teaching employment but for her race. See Plaintiff's response brief at 19. Under this analytical framework, Plaintiff must do more than present evidence that she was qualified for the teaching employment at La Cueva and that someone with different racial characteristics was the beneficiary of the challenged employment decision. See Notari, 971 F.2d at 590. Instead, she must present evidence to support specific facts that sustain a reasonable probability that her race proximately caused her to lose the teaching employment. See id. This alternative standard is applied in reverse discrimination cases because there is no reason to presume racial discrimination against historically favored groups in the event of adverse employment actions. See Livingston v. Roadway Express, Inc., 802 F.2d 1250, 1253 (10th Cir. 1986).

### a) direct evidence

Plaintiff claims there is direct evidence that Defendants did not hire her because she is Caucasian. See Plaintiff's response brief at 20 (responding to Defendants' claim in their opening brief that there is no evidence of reverse racial discrimination); see also Adler, 144 F.3d at 670. In support

9

of her claim, Plaintiff alleges that the interview committee asked Mr. Mitchell, "If we hire you, will you be willing to lead a Black Student Union for La Cueva?",[1] but that the interview committee never asked her the same question. See Plaintiff's response brief at 20, *citing* Stukey v. U.S. Air Force, 790 F.Supp. 165 (S.D.Ohio 1992).

The Stukey case is inapposite to Plaintiff's claim. In that case, the plaintiff, a female, interviewed for a teaching employment. See id. at 167. The interview committee asked the plaintiff certain questions that it did not ask of the male applicants, including questions about her "marital status, her ability to work with men, her opinions on traveling with men, and her child arrangements when she traveled." Id. After learning that the employment was awarded to a male, the plaintiff concluded that she was denied the employment on account of her gender, and so she filed a gender discrimination lawsuit. The plaintiff later filed a motion for summary judgment, claiming that the interview committee's gender-based questions provided direct evidence of gender discrimination. See id. at 170. The court rejected her claim on the ground that a discriminatory interview is not tantamount to a discriminatory employment decision. The court reasoned that in order to sustain her "direct evidence" case, the plaintiff had to show that the defendant relied upon her gender in making its employment decision, which she did not do. See id. at 169, *citing* Bruno v. City of Crown Point, 950 F.2d 355, 362 (7th Cir. 1991) ("Questions based on sex stereotypes do not inevitably prove that

---

[1] There is no admissible evidence in the record that Defendants asked this question of Mr. Mitchell. See *infra* at 12-13. However, there is evidence that Mr. Soto broached the topic of the Black Student Union during Mr. Mitchell's interview. According to the Assistant Principal, Mr. Soto asked Mr. Mitchell if he would be willing to sponsor any extracurricular activities at La Cueva. See Plaintiff's exhibit F at 28, ll. 17-20. When Mr. Mitchell asked Mr. Soto what he meant by "activities," Mr. Soto allegedly replied, "Well, you know, like being a sponsor of a club; we have a black student union here, we have chess, we have a lot of activities, what would you be willing to do?" Id. at 29, ll. 15-19. Because there is evidence that the interview committee did not ask Plaintiff a similar question, the Court will address Plaintiff's argument on this point.

10

gender played a part in a particular employment decision. Bruno must show that the employer actually relied on her gender in making its decision.") (internal quotation omitted).

Like the plaintiffs in the Stukey and Bruno cases, Plaintiff cannot rely upon Mr. Soto's allegedly race-based inquiry as "direct evidence" of reverse racial discrimination. See EEOC v. Wiltel, Inc., 81 F.3d 1508, 1513-14 (10th Cir. 1996) (characterizing as indirect evidence an interviewer's alleged comment that he did not "like" the plaintiff because she was "into" her religion); Ramsey v. City and County of Denver, 907 F.2d 1004, 1008 (10th Cir. 1990) (holding that a director's "feelings about women being better suited to some jobs than others" were not direct evidence of gender discrimination); Furr v. AT&T Techs., Inc., 824 F.2d 1537, 1549 (10th Cir.1987) (holding that managers' repeated statements that plaintiffs were "too damned old," were not direct evidence of a causal relationship between age discrimination and failure to promote). Instead, she must show that the colloquy between Mr. Mitchell and Mr. Soto proximately caused the Principal, as the sole decisionmaker in this matter, to make an employment decision based on race. See Ramsey, 907 F.2d at 1008 ("For Ramsey's [direct evidence] argument to be valid, the evidence would need to show that [the defendant] acted on his discriminatory beliefs."); see also McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998) (ruling that in order to rely upon discriminatory comments, a plaintiff must show that the alleged comments were made by a decisionmaker, and that there was a nexus between the discriminatory statements and the employment decision).

Plaintiff attempts to fashion Mr. Soto's allegedly race-based inquiry into direct evidence by proffering the affidavit of Evey Jones. See Plaintiff's response brief at 8, *citing* Plaintiff's exhibit D. In her affidavit, Ms. Jones states:

11

> Mr. Mitchell returned to my classroom after his interview at La Cueva. I asked him how the interview had gone. He responded enthusiastically and volunteered that he had been asked during his interview by a member of the interview committee whether he would be willing to lead the Black Student Union at La Cueva if he was offered the position. He had a strong feeling that his positive reply to this question had a significant and positive impact on the interview committee.

Plaintiff's exhibit D at 2, ¶ 5.

Ms. Jones' affidavit does not help Plaintiff for four reasons. First, the substance of the testimony therein included is not based upon Ms. Jones' first-hand personal experience, so it is inadmissible under Rule 602 and Rule 701 of the Federal Rules of Evidence. See United States v. Sinclair, 109 F.3d 1527, 1536 (10th Cir. 1997) (stating that evidence is inadmissible under Rule 602 if "the witness could not have actually perceived or observed that which he testifies to."); Gross v. Burggraf Const. Co., 53 F.3d 1531, (10th Cir. 1995) (stating that witness's opinion testimony was inadmissible under Rule 701, "because it was not based on his personal knowledge . . . ."). Second, assuming arguendo that Mr. Mitchell told Ms. Jones that he had "a strong feeling" that his willingness to lead the Black Student Union had "a significant and positive impact on the interview committee," that statement is based upon Mr. Mitchell's speculation into the state of mind of the interviewers, so it is inadmissible under Rule 402 of the Federal Rules of Evidence. See U.S. v. Bowers, 660 F.2d 527 (5th Cir. 1981). Third, the testimony therein included is based upon an out-of-court statement made by Mr. Mitchell and it is being offered to prove the truth of the matter asserted, so it is inadmissible hearsay. See Thomas v. International Business Machines, 48 F.3d 478, 485 (10th Cir. 1995) ("[H]earsay testimony that would be inadmissible at trial may not be included in an affidavit to defeat summary judgment."). And fourth, Plaintiff offers no evidence that the Principal, as the sole decisionmaker in this matter, adopted or actually acted upon Mr. Soto's allegedly race-based inquiry, so the substantive testimony included within Ms. Jones' affidavit has no bearing upon the issue of

Defendants' alleged racial animus. See PAS Communications, Inc. v. Sprint Corp., 139 F.Supp.2d 1149, 1183 (D.Kan. 2001) (ruling that a discriminatory remark made in the presence of a decisionmaker does not, by itself, provide sufficient evidence "for a reasonable jury to infer that defendant discriminated against these plaintiffs on the basis of race."), *citing* McKnight, 149 F.3d at 1129.

For all of the foregoing reasons, Ms. Jones' affidavit does not render Mr. Soto's allegedly race-based inquiry into direct evidence. See Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1136 (10th Cir.2000) (ruling that supervisor's discriminatory comment was not direct evidence because it still required "the trier of fact to infer that discrimination was a motivating cause of an employment decision.") (internal quotation omitted). Thus, Mr. Soto's inquiry may be used as indirect evidence of reverse racial discrimination, but it may not be used as direct evidence of the same.

### b) indirect evidence

In addition to Mr. Soto's allegedly race-based inquiry Plaintiff argues there is other indirect evidence that would support her claim that Defendants did not hire her because she is Caucasian and relies on McGarry v. Board of County Commissioners, 175 F.3d 1193 (10th Cir. 1999). In the McGarry case, the plaintiff, a Caucasian male, unsuccessfully applied for a maintenance employment. After learning that a racial minority was awarded the employment, the plaintiff asked the defendants' director of personnel in writing if the defendants had any hiring preferences. Next to the written question, the personnel director wrote in the word "minorities." Id. at 1196. The personnel director later told the plaintiff that "these hires were minority hirings . . . ." Id. Based on such statements, the Tenth Circuit concluded that the plaintiff had presented sufficient evidence to support a claim of

13

reverse discrimination, and it therefore reversed the district court's summary judgment award in favor of the defendants.

Plaintiff contends that the "case before this Court is stronger than in McGar[r]y, and Ms. Fritzsche has provided substantially more evidence to support her contention of discrimination." Plaintiff's response brief at 19. Plaintiff's contention is bewildering. Unlike the plaintiff in the McGarry case, Plaintiff has not produced any documentary evidence that the interview committee had a hiring preference for minorities, nor has she produced the testimony of an authorized person admitting that race was part of Defendants' hiring decision. Instead, the only evidence Plaintiff has produced is her impressive work history, Mr. Mitchell's relatively new work history, and Mr. Soto's stray reference to La Cueva's Black Student Union. The McGarry case is therefore inapposite.

Plaintiff also contends that Defendants' alleged failure to abide by their own hiring procedures is further evidence of discrimination. See Plaintiff's response brief at 20, *citing* Risher v. Aldridge, 889 F.2d 592 (5th Cir. 1989). In support of her contention, Plaintiff does not direct the Court's attention to any particular portion of the voluminous employment manual attached to her response brief, nor does she articulate how Defendants' alleged failures adversely affected her. Accordingly, the Court rejects this argument.

Notwithstanding Plaintiff's failure to establish a nexus between Mr. Soto's allegedly race-based inquiry and a discriminatory hiring decision, it is clear that Defendants have established a nondiscriminatory justification for their hiring decision.

### 2. nondiscriminatory justification

Defendants claim that even if Plaintiff can establish through indirect evidence a prima facie case of discrimination, they can articulate a nondiscriminatory justification for their employment

decision. See Defendants' opening brief at 16; Notari, 971 F.2d at 591 (permitting a defendant to rebut a plaintiff's prima facie-indirect evidence case by articulating "a nondiscriminatory justification for its [employment] decision."). Defendants point out that the Principal, along with the other members of the committee, opined that Mr. Mitchell was best-suited for the job based on his superior interview, his innovative ideas, his organizational skills, and his perceived ability to discipline the students enrolled in Ceramics and Art 1. See Defendants' exhibit C at 16-17 and 35-37. In contrast, the members of the interview committee opined that Plaintiff was ill-suited for this job because she was interested in working with gifted students,[2] and the students enrolled in Ceramics and Art 1 were not of that caliber. See id. at 34. As the Assistant Principal aptly stated:

> My impression of [Plaintiff] is the fact that she was looking to build a program with gifted students in mediums and areas that we have never attained yet, bringing the art department further up on the scale of excellence; that she impressed me as a person who needed to be at a La Cueva advanced art class or a school like the Academy or Sandia Prep, where you would be working with advanced students, she would be an excellent candidate for those types of students.
>
> What we had instead, sir, was a group of students who were, for whatever reason, placed in those classes that had no interest in art, that had no discipline from the teacher previously and that we needed to find someone that would probably rein them in, get an interest—getting them back interested in art and starting from the ground, rather than having her go in and see if the class actually exists where we thought she would fit better, it would have been a terrible shock to her to go into that class.

Defendants' exhibit B at 25-26.

Thus, while Plaintiff had a great deal of teaching experience and a superior art portfolio, the interview committee believed that Mr. Mitchell had a superior ability to work with the special education and at-risk students enrolled in Ceramics and Art 1, which was the most critical factor in

---

[2] This seems consistent with Plaintiff's own assessment as she promptly resigned to accept a position at the Albuquerque Academy, a private school for gifted students. See Defendants' exhibit A at 78-80.

15

the committee's decision-making process. Accordingly, the interview committee has provided a nondiscriminatory justification for hiring Mr. Mitchell instead of Plaintiff. See E.E.O.C. v. Flasher Co., Inc., 986 F.2d 1312, 1316 (10th Cir. 1992) (stating that in order to meet its burden at this stage in the proceedings, a defendant "merely [has] to articulate through some proof a facially nondiscriminatory reason for the [employment decision].").

Plaintiff also relies on Roberts v. Houston County Board of Educ., 819 F.Supp. 1019, 1026 (M.D.Ala. 1993).[3] Unlike the defendants in the Roberts case, however, Defendants have presented ample evidence that Mr. Mitchell was the person best-suited for the teaching employment. He gave the interview committee the impression that he was the person most capable of working with the students enrolled in Ceramics and Art 1, while Plaintiff clearly conveyed the impression that she was interested in working with a different student population. The interview committee's opinion of Plaintiff's ill-suitedness for the employment is buttressed by Plaintiff's admission that she wanted to leave Rio Grande and its special education and at-risk students because of her desire to "achieve a measure of professional growth" at La Cueva. See Plaintiff's exhibit A at 29-31; Plaintiff's complaint at 6, ¶ 16. The evidence in the record clearly indicates that La Cueva's Ceramics and Art 1 class was not the place for Plaintiff to grow professionally by working with more gifted students. To the contrary, one committee member opined that "it would have been a terrible shock to her to go into that class." Defendants' exhibit B at 25-26.

---

[3] In the Roberts case, the defendants hired a Caucasian woman instead of an African-American woman ("plaintiff"), even though the plaintiff had more experience, a more advanced degree, and an equally impressive college transcript. The plaintiff filed suit against the defendants. The district court awarded judgment in the plaintiff's favor, concluding that the defendants failed to rebut the plaintiff's strong prima facie case, because they "simply presented no evidence to establish that [the person hired] was better qualified than [the plaintiff].") (emphasis added). Id.

16

Plaintiff also claims that Defendants have failed to articulate a legitimate nondiscriminatory reason for not hiring her. See Plaintiff's response brief at 21, *citing* Morton v. City School District of City of New York, 742 F.Supp. 145 (S.D.N.Y. 1990). In the Morton case, the district court rejected a plaintiff's claim that the interview process to which she was subjected was an illegitimate and unaccepted means of assessing qualifications. The district court based its decision on the fact that the members of the interview committee possessed the "candidates' resumes and inquiries were made concerning the candidates' past experiences and agenda for the position if hired." Id. At 148. The Morton case actually favors Defendants' position. Like the interview committee in that case, the APS committee considered the candidates' resumes, reviewed picture slides of their art work, and asked them the same four core questions from an interview sheet. See Defendants' exhibit B at 22; Defendants' exhibit C at 31. Each interviewer graded the candidate's responses and then returned the completed interview sheets to the Principal. See Defendants' exhibit B at 22, ll. 23-25. Mr. Mitchell made the highest score, and he was offered employment. See Plaintiff's exhibit G at 12, ll. 2-8; Defendants' exhibit B at 61. Accordingly, under the Morton case, the interview process used in this case was a legitimate means of assessing the candidates.

### 3. pretext

Plaintiff claims that even if Defendants can provide a nondiscriminatory justification for their employment decision, she can establish that the proffered justification is pretextual. See Plaintiff's response brief at 23; Notari, 971 F.2d at 591 (permitting a plaintiff "to show that the articulated justification is pretextual."). To establish pretext, Plaintiff must show "either that a discriminatory reason more likely motivated the employer or . . . that [Defendants'] proffered explanation is unworthy of credence." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).

17

Plaintiff may satisfy her burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants'] proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotation omitted). However, Plaintiff's speculation or conjecture that Defendants' "explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988).

Plaintiff claims that Defendants' nondiscriminatory justification is pretextual for three reasons. First, it is allegedly pretextual because "reliance on a 20-minute interview is absurd." Plaintiff's response brief at 20. That claim must be rejected on the ground that interviews are a legitimate and accepted means of assessing employment applicants under the Morton case, and the fact that interviews are subjective does not render them per se discriminatory. See Kelley v. Goodyear Tire and Rubber Co., 220 F.3d 1174, 1178 (10th Cir. 2000) ("The claim by [the plaintiff] that somehow the use of subjective factors renders the interview per se discriminatory is meritless."); Grano v. Dept. of Development of City of Columbus, 699 F.2d 836, 837 (6th Cir.1983).

Second, Plaintiff claims that Defendants' nondiscriminatory justification is pretextual, because she was the only candidate who "had previous experience and exemplary performance in teaching special education and at-risk students and had a reputation well deserved for maintaining discipline and order in her classroom." Plaintiff's response brief at 14. Plaintiff misses the point. The members of the interview committee did not opine that she was unqualified for the position, nor did they ignore the fact that she has a wealth of teaching experience and talent. Rather, they opined that Mr. Mitchell was the best person for this employment because he had a superior ability and willingness to work

with the special education and at-risk students enrolled in Ceramics and Art 1, whereas Plaintiff expressed a desire to work with advanced students.

And third, Plaintiff claims that Defendants' nondiscriminatory justification is pretextual, because the members of the interview committee tailored their opinion testimony to meet their predetermined selection. See e.g., Plaintiff's response brief at 6, ¶ 5. In support of her claim, Plaintiff offers nothing more than the argument of counsel. The argument of counsel is not evidence, and therefore does not provide a proper basis for denying summary judgment. See Powell v. COBE Laboratories, Inc., 208 F.3d 227 (10th Cir. 2000) (stating that arguments of counsel are not evidence).

Plaintiff has not produced any admissible evidence showing that Defendants' proffered nondiscriminatory justification for their employment decision is false or unworthy of credence. See Texas Dep't of Community Affairs, 450 U.S. at 256. After a full reading of the record, this Court concludes that Plaintiff cannot show to a reasonable probability that she would have received the teaching employment but for the fact that she is Caucasian. Accordingly, Defendants are entitled to a judgment on Plaintiff's complaint.

## IV.
## CONCLUSION

For the reasons set forth above, the Court finds that the defendants are entitled to a judgment on the plaintiff's complaint. An Order in conjunction with this Memorandum Opinion will issue.

DATED at Albuquerque this 25th day of March, 2002.

_____
BRUCE D. BLACK
United States District Judge

**Attorneys:**

For Plaintiff Elizabeth Fritzsche:

    David L. Norvell, Albuquerque, N.M.

For Defendant Bradford Allison:

    Christopher M. Moody, Albuquerque, N.M.
    Danny W. Jarrett, Albuquerque, N.M.
    Anthony G. Scariano, Chicago Heights, Ill.

For Remaining Defendants:

    Arthur D. Melendres, Albuquerque, N.M.
    George R. McFall, Albuquerque, N.M.
    Max J. Madrid, Albuquerque, N.M.
    Michelle A. Hernandez, Albuquerque, N.M.